UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLENE TOBIN, et al., | Case No. 2:25-cv-02259-CSK |
| Plaintiffs, | ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| v. | |
| BROOKE L. ROLLINS, IN HER OFFICIAL CAPACITY AS THE U.S. SECRETARY OF AGRICULTURE, et al., | (ECF Nos. 13, 14) |
| Defendants. | |

Pending before the Court are cross-motions for summary judgment by Plaintiffs Charlene Tobin, Carol Mrozek, and Craig Downer and Defendants Brooke L. Rollins, in her official capacity as the U.S. Secretary of Agriculture, United States Forest Service ("USFS"), and Doug Burgum, in his official capacity as the U.S. Secretary of the Interior, and Bureau of Land Management ("BLM").[1] Plaintiffs bring this action challenging Defendants BLM and USFS' March 7, 2025 Decision ("2025 Decision") to conduct the removal of wild horses outside the Montgomery Pass Wild Horse Territory near Bishop, California. Compl. (ECF No. 1). Plaintiffs bring claims alleging Defendants have violated

---

[1] This case proceeds before the undersigned pursuant to 28 U.S.C. § 636(c) for all purposes, including the entry of judgment, pursuant to the consent of all parties. (ECF Nos. 7, 10, 11.)

1

the Wild Free-Roaming Horses and Burros Act ("Wild Horse Act"), the National Environmental Policy Act ("NEPA"), and the Administrative Procedure Act ("APA") in issuing its 2025 Decision for removal of excess wild horses. *Id.* The cross-motions for summary judgment are fully briefed. (ECF Nos. 13, 15, 19, 27.) On January 20, 2026, the Court held a hearing. (ECF No. 30.) Attorney Sarah Perez and certified law student Jamie Browning appeared on behalf of Plaintiffs, and attorney Jacob Jose and Edward Olsen appeared on behalf of Defendants.[2] *Id.* For the reasons that follow, the Court DENIES Plaintiffs' motion for summary judgment and GRANTS Defendants' motion for summary judgment.

## I.   BACKGROUND

### A.   Factual Background

The Montgomery Pass Wild Horse Territory ("Territory") contains approximately 207,921 acres along the California/Nevada border and is located north of Bishop, California and east of Mono Lake in the Eastern Sierra Nevada Mountains. AR 9401 (ECF No. 9). The Territory is comprised of federal, state and private lands. *Id.* The Territory includes public lands managed by both BLM and USFS, and encompasses the USFS' Montgomery Pass Wild Horse Territory and BLM's Montgomery Pass Herd Management Area.[3] *Id*. The Territory is the area inhabited by wild horses when the Wild Free-Roaming Horses and Burros Act was enacted by Congress on December 15, 1971. *Id*. The Inyo National Forest is the lead unit for the management of the Territory. *Id*. National Forest Service Lands are administered by the Mono Lake Ranger District, Inyo National Forest, and the Bridgeport Ranger District, Humboldt-Toiyabe National Forest. *Id.* The BLM Public Lands within the Territory are administered by the Bishop and Stillwater Field Offices. *Id.*

---

[2]   The Court appreciates the professionalism and effective advocacy of all counsel and the certified law student.

[3]   The USFS uses the term "Wild Horse Territory" and the BLM uses the term "Herd Management Area" for the "legally designated area where wild horses are to be managed with the appropriate management levels." AR 9401.

In 1971, the Territory had an estimated wild horse population of 50 wild horses. AR 9401, 9418. In 1988, the Territory Coordinated Resource Plan established an appropriate management level[4] of 138-230 wild horses for the Territory. AR 9402, 9418. The appropriate management level for the Territory applies to the number of adult wild horses to be managed within the population and does not include current year's foals. AR 9402. The 1988 census estimated 184 wild horses associated with the Territory. AR 9418. During the period of 1987-2011, the estimated total population of wild horses in the Territory and in the Adobe Valley area adjacent to the Territory, ranged from 138 in 1995 to 312 in 2011. AR 9418-19. The horse population estimates were generated from a collection of repeated aerial and ground observations, which were supplemented by periodic video and photographic records. AR 9419. In November 2015, USFS and BLM personnel began conducting simultaneous double-observer aerial surveys of the wild horse population in areas of importance to populations of the Bi-State sage grouse, including areas inside and outside the Territory. *Id.* Aerial surveys estimated 397 of the 553 wild horses were outside the boundaries of the Territory in the November 2015 census. AR 9402, 9419, 9421. Of the total number of wild horses, 54 of these were foals. AR 9419. In October 2020, USFS and BLM personnel conducted simultaneous double-observer aerial surveys of the wild horse population in the Territory. *Id*. Aerial surveys estimated 498 of the 654 wild horses were outside the boundaries of the Territory in the October 2020 census. AR 9402, 9419, 9421. Of the total number of wild horses, 70 of these were foals. AR 9419. In February 2024, USFS and BLM personnel conducted simultaneous double-observer aerial surveys of the wild horse population and counted approximately 683 adult wild horses. *Id*. A statistical analysis of the data was completed in April 2024 estimating that at least 694 wild horses were present in the surveyed area and that 624 wild horses were located outside the Territory. AR 9402, 9419. The estimated number of foals for 2024 was identified as five foals, which was not

---

[4]  The parties and records refer to appropriate management level as "AML."

reflective of the full cohort of foals for 2024 because most foals were not born at that time. AR 9419.

Since the establishment of the Territory in 1971, the wild horse population has increased in an open range environment and in the absence of a population control program. AR 3387, 9401-02, 9418. The wild horse population of the Territory has not experienced removals since 1984, largely due to the well-established pattern of mountain lion predation on these wild horses. AR 3387, 9402, 9420. The mountain lion predation on wild horse foals has played a critical role in moderating growth of the Territory wild horse population. AR 3387, 3409. The increase in the Territory wild horse population and migration outside of the Territory to the Adobe Valley area has been attributed to less mountain lion predation in lower elevations. AR 3407, 9420. Horse migration from the Territory to areas outside the Territory has been well-documented. AR 9419. Census flights have confirmed wild horses residing as far as 15-20 miles outside the Territory year-round. AR 9420. Historically, the Territory wild horses have followed an annual season-driven migration from inside to areas outside the Territory from high elevation summer range to lower elevation winter range. AR 9419. In a 2015 study, the following migration patterns for the Territory wild horses was noted:

> Distinct summer (higher elevations) and winter (lower elevations) range use was characteristic for more than 60% of the population during the first 7 study years, with subsequent gradual but marked reduction in use of summer range. While approximately 20% of the population continued to annually use the historical summer range, the majority divided into two geographically and functionally separate subpopulations that resided year-round in the historical winter range and adjacent areas on opposite sides of the MPWHT [Territory].
>
> […]
>
> More than 90% of the horses ceased using the [key summer range] across the study wintered inside the MPWHT. However, between May and late September from 1995 to 2011, these horses distributed themselves across range areas both inside and outside the MPWHT.

AR 3386, 3399, 9419-20.

On November 7, 2023, Defendants BLM and USFS announced their proposal to gather and remove excess wild horses located outside the Territory and initiated a 30-day external scoping period. AR 9408. A total of 381 written comment submissions were received during the public scoping period. AR 9238-47, 9408. On May 28, 2024, a legal notice of opportunity to comment on the preliminary Environmental Assessment ("EA") was published in the newspaper of record, initiating a 30-day public review and comment period from May 28, 2024 to June 26, 2024. AR 9408. Comments were received from approximately 4,540 individuals, 14 organizations, and 3 agencies/local entities during the comment period. AR 9285-397, 9408-09. On August 8, 2024, the final EA (AR 9398-464) was issued, and a Finding of No Significant Impact (AR 9897-9900), Decision Notice (AR 10066-72), and Decision Record (AR 9532-39) were issued on March 7, 2025 (collectively "2025 Decision").

In their 2025 Decision, BLM and USFS concluded that wild horses that reside outside of the boundaries of the Territory (624 of the 694) are in excess and removal is necessary to achieve and maintain a thriving ecological balance. AR 9534, 10066. The rationale provided for the 2025 Decision was based on vehicle-horse and bike-horse collisions creating a hazard to the public; degradation of the natural environment; creation of trails and soil compaction; loss of vegetation in sagebrush systems that provide habitat for species proposed for listing under the Endangered Species Act; and nuisance horses on private property outside the Territory. AR 9535, 10066-67.

Plaintiff Tobin is a primary care physician who visits the Territory wild horses three to five times each year to photograph, study and film them. Compl. ¶ 7. Plaintiff Tobin is currently working on completing a photographic essay containing seasonal photographs of the Territory wild horses and needs the winter season to finish it. *Id.* Plaintiff Mrozek is a documentary filmmaker who is finishing a documentary on the Territory wild horses in early October 2025 and who has already aired a segment of his documentary on "CBS Sunday Morning." *Id*. ¶ 8. Plaintiff Downer is a scientist, wildlife ecologist, author of scientific and popular articles and books concerning wild horses, burros and tapirs, and

is also the President of the Andean Tapir Fund/Wild Horse and Burro Fund. *Id*. ¶ 9. Plaintiff Downer has also been visiting the Territory wild horses for sixty years. *Id*.

**B.      Procedural Background**

On August 11, 2025, Plaintiffs filed their Complaint. *See* Compl. Plaintiffs allege four causes of action against Defendants. First, Plaintiffs allege that Defendants violated the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701-1787, the Wild Horse Act, and the APA by failing to maintain the appropriate management level for the Territory. Compl, ¶¶ 77-84. Plaintiffs allege Defendants have not completed any public process to formally lower the appropriate management level in the Territory, have not determined or justified lowering the appropriate management level for the Territory as being necessary or an emergency, and have failed to prioritize relocation of the wild horses to the Territory or some other wild horse herd management area. *Id.* Second, Plaintiffs allege that Defendants have failed to consider the impacts of the 2025 Decision on the entire range in violation of the Wild Horse Act, NEPA, and the APA. *Id*. ¶¶ 85-90. Plaintiffs allege Defendants have failed to consider the impacts of the 2025 Decision on the remaining wild horse herd population and its ability to survive or maintain its genetic diversity, the impact on the Territory's thriving natural ecological balance, and have failed to consider a reasonable range of alternatives to the proposed action that would protect the Territory. *Id.* Third, Plaintiffs allege Defendants violated the National Forest Management Act pursuant to 16 U.S.C. §§ 1600-1614, the Federal Land Policy and Management Act, the Wild Horse Act, and the APA for failure to manage the Territory. *Id*. ¶¶ 91-99. Plaintiffs allege Defendants have failed to prepare a herd management area plan for the Territory as legally required, failed to complete the studies and analysis necessary to manage the wild horse population, and failed to consider implementing less expensive and less invasive management activities. *Id.* Fourth, Plaintiffs allege Defendants violated the Wild Horse Act, NEPA, and the APA based on the 2025 Decision's reliance on improper and incomplete data where they rely on appropriate management level data from 1988. *Id*. ¶¶ 100-103.

6

For relief, Plaintiffs request the Court: (1) declare that Defendants acted in a manner that is arbitrary, capricious, an abuse of discretion, and/or contrary to law pursuant to NEPA, the WHPA, and the APA in issuing the 2025 Decision and undertaking the gather and removal of wild horses outside the Territory; (2) vacate, reverse, and set aside the 2025 Decision authorizing the planned gather and removal of all wild horses outside the Territory; (3) prevent the removal of wild horses within the Territory, or the removal of wild horses which roam off and on the Territory; (4) enjoin BLM from implementing the 2025 Decision unless and until the agency demonstrates compliance with applicable laws; (5) require the agencies to complete a herd management area plan for the Territory; (6) award Plaintiffs' reasonable attorney's fees, expenses, costs incurred in this action pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and (7) grant Plaintiffs injunctive relief and any other additional relief the Court deems just and equitable. *Id*. at 30.

Plaintiffs moved for summary judgment on September 4, 2025. Pls. MSJ (ECF No. 13). On September 18, 2025, Defendants filed their cross-motion for summary judgment and opposition to Plaintiffs' motion. Defs. Ntc MSJ (ECF No. 14); Defs. MSJ (ECF No. 15). Plaintiffs filed their reply and opposition to Defendants' motion on September 29, 2025. Pls. Reply (ECF No. 19). On October 1, 2025, Defendants filed a motion for a temporary stay in light of the lapse in appropriations due to the federal government shutdown, which the Court granted. (ECF Nos. 23, 24.) After the shutdown ended, on November 20, 2025, Defendants filed an unopposed motion to lift the stay and to modify the briefing schedule on the parties' cross-motions for summary judgment. (ECF No. 25). The Court lifted the stay of this action and ordered Defendants to file their reply brief no later than December 12, 2025 and set the hearing on the parties' pending motions for January 20, 2026. 11/24/2025 Order (ECF No. 26). On December 12, 2025, Defendants filed their reply. Defs. Reply (ECF No. 27). A hearing was held on January 20, 2026. (ECF No. 30.)

/ / /

## II.    LEGAL STANDARDS

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate when there is "no genuine dispute as to any material fact and the mov[ing party] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). However, "in a case involving review of a final agency action under the Administrative Procedure Act...the standard set forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record." *Desert Prot. Soc'y v. Haaland*, 2023 WL 6386901, at *2 (E.D. Cal. Sept. 29, 2023) (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994). Instead, a court conducting a review of a final agency action under the APA does not resolve factual questions but instead determines "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Conservation Cong. v. U.S. Forest Serv.*, 2014 WL 2092385, at *4 (E.D. Cal. May 19, 2014) (internal quotation marks and citation omitted). Because neither the Wild Horse Act nor NEPA "contain an internal standard of judicial review," the APA governs a court's review of an agency's challenged actions. *In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1061 (9th Cir. 2014).

Under the APA, an agency action must be held "unlawful and set aside" when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Although this review is 'searching and careful,' the arbitrary and capricious standard is narrow, and this court cannot substitute its own judgment for that of the agency." *In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary*, 751 F.3d at 1061 (citing *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 858 (9th Cir. 2005)). An agency's action is arbitrary and capricious if it "fails to consider important aspects of the issue before it, if it supports its decisions with explanations contrary to the evidence, or its decision is either inherently implausible or contrary to governing law." *Cent. Oregon Wild Horse Coal. v. Vilsack*, 2025 WL 25696, at *1 (9th

Cir. Jan. 3, 2025) (quoting *In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary*, 751 F.3d at 1066).

## III.    DISCUSSION

Plaintiffs move for summary judgment arguing the 2025 Decision violates the Wild Horse Act and NEPA. Pls. MSJ. Defendants move for summary judgment arguing their 2025 Decision is in compliance with the requirements set forth by these statutes. Defs. MSJ. The Court recognizes and appreciates the concerns and dedication Plaintiffs have to wild horses in this region. But USFS and BLM are tasked with considering not just wild horses, but the overall environment, which includes many other species of animals and plant life. Overpopulation of wild horses can have negative effects on the overall environment, and these federal agencies that manage public lands are charged with removing wild horses when removal is needed to "restore a thriving natural ecological balance to the range, and protect the range from the deterioration associated with overpopulation." 16 U.S.C. § 1333(b)(2). In addition, "the agencies will not permanently remove wild horses to numbers below the Territory's appropriate management levels." Defs. Reply at 2. The Court holds that the 2025 Decision does not violate the Wild Horse Act or NEPA. For the reasons that follow, the Court denies Plaintiffs' motion for summary judgment and grants Defendants' motion for summary judgment. [5]

---

[5]  Plaintiffs have abandoned their claims based on the alleged violation of the National Forest Management Act or the Federal Land Policy and Management Act where Plaintiffs did not move for summary judgment on these bases. *Compare* Compl. ¶¶ 77-84 (first cause of action also alleging violation of Federal Land Policy and Management Act), 91-99 (third cause of action also alleging violation of National Forest Management Act and Federal Land Policy and Management Act), *with* Pls. MSJ (not addressing either National Forest Management Act or the Federal Land Policy and Management Act). *See Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1050 (9th Cir. 2012) (district court held that plaintiff abandoned certain claims that it failed to present arguments regarding at summary judgment); *W. Watersheds Project v. Lueders*, 122 F. Supp. 3d 1039, 1054-55 (D. Nev. 2015), *aff'd sub nom. W. Watersheds Project v. Ruhs*, 701 F. App'x 651 (9th Cir. 2017) (holding plaintiff abandoned Federal Land Policy and Management Act claim where plaintiff failed to brief the claim in its motion for summary judgment and failed to respond to BLM's summary judgment argument). This does not, ultimately, affect the Court's decision here where Plaintiffs moved for summary on all four claims and there is no indication that the analysis would have been different had Plaintiffs raised the two

**A.    The Wild Free-Roaming Horses and Burros Act ("Wild Horse Act")**

In 1971, Congress enacted the Wild Free-Roaming Horses and Burros Act to protect wild free-roaming horses and burros from "capture, branding. harassment, or death." 16 U.S.C. § 1331. Congress had found and declared that wild free-roaming horses and burros "are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of American people; and that these horses and burros are fast disappearing from the American scene." *Id.* Under the Wild Horse Act, the Secretaries of the Interior and Agriculture provide for protection and management of wild horses on federal lands controlled by BLM and USFS "in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333; *see also id.* §§ 1331-32. To achieve this, the Wild Horse Act directs the Secretaries to maintain an inventory of wild horses on public lands to determine whether "'an overpopulation exists on a given area' and whether 'action is necessary to remove excess animals.'" *Am. Wild Horse Campaign v. Bernhardt*, 963 F.3d 1001, 1005 (9th Cir. 2020) (quoting 16 U.S.C. § 1333(b)(2)). The purpose of maintaining such an inventory is to:

> [M]ake determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals; determine appropriate management levels of wild free-roaming horses and burros on these areas of the public lands; and determine whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels).

16 U.S.C. § 1333(b)(1). The Wild Horse Act defines "excess animals" as wild horses "which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." *Id*. § 1332(f). The Wild Horse Act requires the Secretaries to use "currently available" information to make

---

other statutes in their motion. For example, though Plaintiffs refer to the Federal Land Policy and Management Act in their reply, this does not change the analysis. *See* Pls. Reply at 2, 11, 12.

the determination whether there is an excess population of wild horses and whether action must be taken. *Id*. § 1333(b)(2). When the Secretaries make a finding that an overpopulation exists and that "action is necessary to remove excess animals," they "shall immediately remove excess animals from the range so as to achieve appropriate management levels." 16 U.S.C. § 1331(b)(2).

Plaintiffs move for summary judgment on their Wild Horse Act claim arguing the 2025 Decision to remove excess wild horses from outside the Territory violates the Wild Horse Act. Pls. MSJ. at 9. Plaintiffs make three main arguments: (1) Defendants' excess determination of wild horses was made arbitrarily and capriciously; (2) Defendants have not made a determination whether the removal of excess wild horses will maintain a thriving natural ecological balance within the Territory; and (3) the 2025 Decision will result in a reduction of wild horses well below the appropriate management level's lower limit within the Territory. *Id*. at 9-16.

In opposition, Defendants argue the 2025 Decision was reasonably decided because the excess wild horses reside outside of the Territory, they are on public lands not designated for their use, and they are causing damage to other geological, cultural, and natural resources, threatening the thriving natural ecological balance on the public lands. Defs. MSJ at 12-14. Defendants further assert that Plaintiffs' argument that an additional determination regarding whether the removal of excess wild horses will ensure a thriving natural ecological balance within the Territory is not required and contrary to the Wild Horse Act. *Id*. at 23-25. Defendants also contend that the 2025 Decision provided, if necessary, that wild horses could be relocated to the Territory to supplement the population and maintain the appropriate management level and that it is not a de facto reduction of the appropriate management level for the Territory. *Id*. at 25-27.

1. <u>Determination of Excess Wild Horses in the Territory (Third Cause of Action)</u>

Plaintiffs argue Defendants' determination that 624 of the 694 wild horses of the Territory are in excess and subject to removal was arbitrary and capricious because it

11

was made in absence of a herd management area plan. Pls. MSJ at 9; *see* Compl. ¶¶ 91-99 (third cause of action). Plaintiffs further argue an updated appropriate management level was required before Defendants made their determination of the number of excess wild horses in the Territory. Pls. MSJ at 9. Defendants argue its excess determination is not arbitrary and capricious because there is no duty to prepare a herd management area plan for an area outside of the Territory and even so, that a herd management area plan currently exists for the Territory. Defs. MSJ at 16. Defendants further argue the Wild Horse Act does not require updating an appropriate management level prior to a removal and even if it did, that such a requirement is not applicable here as the removal is designated to an area that is outside the Territory. *Id*. at 19, 23.

The Wild Horse Act requires the Secretaries to compile and maintain "current inventor[ies] of wild horses [] on given areas of the public lands." 16 U.S.C. § 1333(b)(1). Inventories of wild horses are used to designate herd management areas by the BLM and to determine appropriate management levels. *See* 43 C.F.R. § 4710.3-1; 16 U.S.C. § 1333(b). Appropriate management levels are defined as "a population range with both an upper and lower limit within which wild horses [] can be managed for the long term." *Am. Wild Horse Pres. Campaign v. Jewell*, 847 F.3d 1174, 1178 (10th Cir. 2016) (internal quotation marks omitted). BLM is required to prepare a herd management area plan ("HMAP"), which may cover one or more herd management areas. *See* 43 C.F.R. § 4710.3-1. Courts in the Ninth Circuit have held that there is no firm deadline for developing a herd management area plan. *See Wild Horse Educ. v. United States Dep't of the Interior, BLM*, 2025 WL 2073994, at *2 (D. Nev. July 22, 2025); *Leigh v. Raby*, 726 F. Supp. 3d 1207, 1217 (D. Nev. 2024), *appeal dismissed*, No. 24-3534, 2024 WL 5709632 (9th Cir. Dec. 23, 2024). Management of herd areas ("HA") are distinct from management of herd management areas and the BLM is required to manage wild horses "with the objective of limiting the animals' distribution to herd areas." 43 C.F.R. § 4710.4 ("Management shall be at the minimum level necessary to attain the objective

identified in approved land use plans and [herd management area plans].") The Secretaries are afforded broad discretion in the removal and management of wild horses under the Wild Horse Act. *In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary*, 751 F.3d 1065 n.16 (citing *Am. Horse Prot. Ass'n, Inc. v. Frizzell*, 403 F. Supp. 1206, 1217 (D. Nev. 1975)).

Here, the 2025 Decision determined that "excess wild horses are present outside of the boundaries of the Territory and that removal of these wild horses is necessary to achieve and maintain a thriving natural ecological balance." AR 10066. The 2025 Decision also concluded that the 624 wild horses located outside the Territory boundaries must be removed and that "[w]ithout action, wild horses would continue to reside outside of the Territory in areas not designated for the management of wild horses and that are being managed for natural resource values that are being impacted by their presence." AR 10066. Although Plaintiffs argue the 2025 Decision was made arbitrarily because it was made without a herd management area plan and therefore decided "blindly," Defendants were not required to prepare a herd management area plan for a herd area outside a designated herd management area . *See W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1285 (D. Utah 2017) (distinguishing between herd areas and herd management areas and noting that herd areas are "generally *not* managed for wild horse populations" and are therefore "the AML of a given HA [("herd area")] is typically zero.").

Further, the Court finds that Defendants made a proper "excess" determination, a prerequisite to removal under the Wild Horse Act. 16 U.S.C. § 1332(b)(2). In its determination, Defendants relied on "currently available" information by relying on census flights as recent as 2024 of wild horses as they migrated inside and outside the Territory; the 1988 Territory Coordinated Resource Management Plan setting the appropriate management level for wild horses within the Territory as between 138 to 230 horses; and the degradation of the natural environment as provided in the EA to the designated areas outside the Territory. AR 9401-02. When the Secretaries make a

13

finding that an overpopulation exists and that "action is necessary to remove excess animals," they "shall immediately remove excess animals from the range so as to achieve [appropriate management levels]." 16 U.S.C. § 1331(b)(2); *see also In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary*, 751 F.3d at 1062 ("BLM is *required* to remove wild horses and burros from a given area of the public lands when an overpopulation exists."). "Nothing in the [Wild Horse Act] requires the BLM to determine new appropriate management levels based on current conditions every time the BLM decides to take action to restore the already-established AMLs." *Id.* at 1064 n.13. Despite the administrative record reflecting that there is horse migration inside and outside the Territory, it also indicates the wild horses have moved outside of the Territory and have been permanently residing outside the Territory. *See* AR 9422. The Wild Horse Act does not impose on Defendants the "duty to prevent wild horses from straying" from the herd management area. *Fallini v. Hodel*, 783 F.2d 1343, 1346 (9th Cir. 1986) ("Although the BLM is charged with broad duties in managing the animals on public lands, *see* 16 U.S.C. §§ 1331, 1333, the Act fails to charge the BLM with a duty to prevent straying.").

Accordingly, Plaintiffs have not established that Defendants acted in an arbitrary and capricious manner in making its "excess" determination in their 2025 Decision. Summary judgment is denied for Plaintiffs and granted for Defendants on Plaintiffs' excess determination claim (third cause of action).

   2. <u>Thriving Natural Ecological Balance in the Territory (Second Cause of Action)</u>

Plaintiffs argue Defendants have not determined whether the removal of excess wild horses *outside* the Territory will maintain a thriving ecological balance *within* the Territory and therefore is in violation of the Wild Horse Act. Pls. MSJ at 11-12; *see* Compl. ¶¶ 85-90 (second cause of action). Defendants argue the Wild Horse Act requires agencies to determine whether removal is necessary to maintain and preserve a thriving ecological balance in the specific area where the removal will occur.

14

Defendants contend they did so here because removal will occur outside the Territory. Further, an additional determination as to whether there is a thriving natural ecological balance within the Territory is not required. Defs. MSJ at 24-25.

Under the Wild Horse Act, the Secretaries are charged with managing and protecting wild horses on federal lands that they control "in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). Where the Secretaries determine that "an overpopulation exists on a *given* area of the public lands and that action is necessary to remove excess animals," the Secretaries must "immediately remove excess animals from the range so as to achieve appropriate management levels" and that such action shall be taken "until all excess animals have been removed so as to restore a thriving natural ecological balance to the range, and protect the range from deterioration associated with overpopulation." *Id.* § 1333(b)(2) (emphasis added). Here, Defendants were not required to make an additional determination that removing wild horses from *outside* the Territory would maintain the thriving natural ecological balance *inside* the Territory. *See id.* The removal of the wild horses here is exclusively for wild horses located outside the Territory and Defendants are not seeking to remove wild horses from within the Territory, thereby requiring an additional determination as to the thriving natural ecological balance within the Territory. Moreover, in its consideration of removal of wild horses outside the Territory, the 2025 Decision premised its decision on evidence that not removing excess wild horses would undermine the thriving ecological balance of the area outside the Territory and that removal of the excess wild horses would "eliminate ongoing impacts to archaeological resources caused by displacement of artifacts, damage to features, erosion and breakage" (AR 928-29); "may reduce the spread of invasive species and allow native vegetation communities to be more resilient to wildfire" (AR 9430); "impacts to tufa from trailing, trampling, and rubbing by wild horses would be substantially reduced, if not eliminated" (AR 9431-32); "reduce or eliminate the potential for wild horse/vehicle collisions and improve visitor safety" (AR 9432-33); "would likely result in a

reduction in vectors of spread as well as fewer disturbed sites that are vulnerable to invasion" (AR 9433-34); and removal of excess wild horse "increase forage availability and quality, minimize competition for water and forage between livestock and wild horses, and improve vegetative resources"[6] (AR 9434-46). The Court therefore finds that Defendants engaged in an analysis of the thriving natural ecological balance of the area where the removal of horses will occur, which is outside the Territory, and that Defendants were not required to engage in an additional analysis of the impact on the natural ecological balance within the Territory. In addition, the administrative record supports the 2025 Decision that the removal of excess wild horses outside the Territory was necessary to achieve and maintain a thriving natural ecological balance in areas not designated for the management of wild horses and that are being managed for natural resource values. AR 10066. Because the appropriate management level is typically considered zero in a herd area, and the removal area is a herd area and not a herd management area, the removal of excess wild horses outside the Territory is proper and not in violation of the Wild Horse Act. *See W. Rangeland Conservation Ass'n*, 265 F. Supp. 3d at 1285.

Accordingly, Plaintiffs have not established that Defendants acted in an arbitrary and capricious manner in not conducting an additional determination of the thriving natural ecological balance within the Territory, where removal of excess horses will not occur. Summary judgment is therefore denied for Plaintiffs, and granted for Defendants on Plaintiffs' thriving natural ecological balance claim (second cause of action).

           3.     <u>Reduction of Wild Horses Below the Appropriate Management Level</u>
                    <u>(First Cause of Action)</u>

Plaintiffs argue the 2025 Decision to reduce the Territory wild horse herd to 70 horses is well below the established appropriate management level for the Territory and

---

[6] "Forage and available water are being utilized by both wild horses and livestock in permitted grazing allotments outside the Territory in areas not designated for wild horse management." AR 9434-46.

that this will risk the viability and genetic diversity of the Territory wild horses, thereby violating the Wild Horse Act. Pls. MSJ at 14-16; *see* Compl. ¶¶ 77-84 (first cause of action). Defendants argue their intention is not to reduce the wild horse population within the Territory below the established appropriate management level. Defendants further argue that if the removals outside the Territory cause the wild horse population within the Territory to drop below the appropriate management level, the agencies may relocate wild horses back to the Territory to maintain its appropriate management level. Defs. MSJ at 25-26; Defs. Reply at 2.

Plaintiffs' argument misses the mark. From the most recent census from 2024, the population of wild horses within the Territory is 75 horses.[7] AR 9419, 9421, 6553. In 1971 when the Wild Horse Act was passed, the population within the Territory was 50 horses. AR 9418. The proposed removal of wild horses are for horses located <u>outside</u> the Territory; therefore, this removal does not reduce the population or appropriate management level <u>within</u> the Territory. In addition, the 2025 Decision expressly contemplates potential relocation of excess horses from outside the Territory to move those horses inside the Territory to meet the low end range of the appropriate management level for the Territory: "The established AML for the [Territory] in conjunction with current census data would be considered when determining whether to remove excess horses or relocate some back into the Territory. Horses could be relocated back into the Territory to meet the low end of the AML range." AR 9410; *see* Defs. MSJ at 25-26. Defendants have emphasized that "the agencies will not permanently remove wild horses to numbers below the Territory's appropriate management levels." Defs. Reply at 2. The Court directly addressed this issue at the hearing and Defendants confirmed their representation in their reply brief.

Summary judgment is therefore denied for Plaintiffs, and granted for Defendants

---

[7]  Though Plaintiffs note that the population is 70, this appears incorrect. *See* AR 9419, 9421, 6553. Regardless, the analysis does not change if the population is 70 rather than 75 wild horses.

on Plaintiffs' appropriate management level claim (first cause of action).

**B.     The National Environmental Policy Act ("NEPA")**

Plaintiffs move for summary judgment on their NEPA claim (second cause of action) arguing the 2025 Decision to remove excess wild horses outside the Territory violates NEPA because the Environmental Assessment failed to address the impacts on the remaining wild horse population inside the Territory. Pls. MSJ at 16-17. Plaintiffs appear to argue in their reply that Defendants could have addressed other alternatives in the Environmental Assessment, but do not argue that the Environmental Assessment actually fails to meet NEPA's alternatives provision. *See* Pls. Reply at 13.

In 1969, Congress enacted NEPA, "our basic national charter for protection of the environment." *Ctr. for Biological Diversity v. U.S. Forest Serv*., 349 F.3d 1157, 1166 (9th Cir. 2003) (citation omitted). NEPA provides procedural safeguards by requiring a federal agency "consider every significant aspect of the environmental impact of a proposed action" before taking the proposed action. *Ctr. for Biological Diversity v. BLM*, 141 F.4th 976, 993 (9th Cir. 2025) (quoting *Kern v. BLM*, 284 F.3d 1062, 1066 (9th Cir. 2002)). NEPA also ensures that relevant information is made available to the public. *Cascadia Wildlands v. United States Bureau of Land Mgmt.*, 153 F.4th 869, 879 (9th Cir. 2025). NEPA requires a federal agency to prepare a detailed statement, referred to as an Environmental Impact Statement ("EIS"), before taking action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

If an agency is not sure whether the environmental impacts will be significant and require the preparation of an EIS, an agency may first prepare an Environmental Assessment ("EA"), which is a "concise public document" with sufficient analysis to decide whether the environmental impact of the agency's proposed action is significant or not significant. *See* 40 C.F.R. § 1508.9(a); *WildEarth Guardians v. United States Dep't of Agric. Animal & Plant Health Inspection Serv. Wildlife Servs.*, 135 F.4th 717, 728 (9th Cir. 2025). If the agency determines that the action will have significant environmental impacts, the agency must then prepare an EIS, which is a more detailed report.

*WildEarth Guardians*, 135 F.4th at 728. If the agency determines that the action will not have significant environmental impacts, the agency issues a Finding of No Significant Impact ("FONSI") and does not have to prepare an EIS. *Cascadia Wildlands*, 153 F.4th at 879 (citing *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 42 (9th Cir. 2025); 40 C.F.R. § 1508.13).[8] "In short, NEPA requires the preparation of reports that inform the agency and the public of the environmental consequences of proposed projects." *Cascadia Wildlands*, 153 F.4th at 879 (citing *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 145 S. Ct. 1497, 1510 (2025)).

"The limited scope of NEPA also circumscribes the scope of judicial review. As the Supreme Court emphasized in *Seven County Infrastructure Coalition*, 'the central principle of judicial review in NEPA cases is deference.'" *Cascadia Wildlands*, 153 F.4th at 879 (quoting *Seven Cnty. Infrastructure Coal.*, 145 S. Ct. at 1511). "The 'role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one.'" *Seven Cnty. Infrastructure Coal.*, 145 S. Ct. at 1514-15 (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 555 (1978)). In reviewing an agency's decision not to prepare an EIS under NEPA, as is the case here, the reviewing court uses an arbitrary and capricious standard that requires the court to determine whether the agency took a "'hard look' at the consequences of its actions, based its decision on a consideration of the relevant factors, and provided a convincing statement of reasons to explain why a projects impacts are insignificant." *In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary*, 751 F.3d at 1068 (citation omitted).

Under the required deferential standard of review, the Court concludes that Defendants took the required hard look at the impacts of the proposed removal,

---

[8] As Defendants noted in their motion and opposition, the NEPA regulations at 40 C.F.R. were rescinded effective April 11, 2025. *See* Defs. MSJ at 7 n.4 (citing 90 Fed. Reg. 10610 (Feb. 25, 2025)); *see also* 91 Fed. Reg. 618 (Jan. 8, 2026). The Environmental Assessment and Decision at issue in this action were prepared under the NEPA regulations that were previously in effect.

considered the relevant factors, and explained why the environmental impact of the proposed removal is not significant. The Environmental Assessment in this case is more than a "concise public document" and provides sufficient analysis and evidence. It addresses the wild horse population within the Territory. *See, e.g.,* AR 9401-02 (increase in wild horse population without population control measures after 1984 and population inside and outside the Territory), 9403 (horses leaving Territory and remaining outside the Territory indicate insufficient habitat within the Territory for current horse population), 9411 (consider herd health and other factors in determining gather schedule), 9418-21 (wild horse population inside and outside the Territory, analysis of migration of wild horses outside the Territory). The Environmental Assessment also addresses the potential impact of the proposed removal on the wild horse population within the Territory by acknowledging that the appropriate management level and census data would be considered in determining whether to relocate horses from outside the Territory to inside the Territory to meet the low end of the appropriate management level range. *See* AR 9410; *see also* AR 9411 (review "most current population estimates" before conducting follow-up gathers). Finally, the Environmental Assessment addresses a no action alternative (AR 9409, 9417-18 9427, 9429, 9430, 9432, 9434, 9436, 9438, 9441, 9446-47, 9449, 9453, 9458); reasonable alternatives with different removal methods (AR 9417-18); and the proposed action. This satisfies NEPA's requirements. *See Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005) (federal agency complied with NEPA in preparing an Environmental Assessment where the agency considered only two alternatives: a no action alternative and a preferred alternative); 40 C.F.R. § 1508.9(b) (requiring only a brief discussion of reasonable alternatives in an Environmental Assessment).

The Court concludes that Defendants have not violated NEPA. Summary judgment is denied for Plaintiffs and granted for Defendants on the NEPA claim.

/ / /

/ / /

## IV.    CONCLUSION

In conclusion, IT IS HEREBY ORDERED that:

1.    Plaintiffs' motion for summary judgment (ECF No. 13) is DENIED;

2.    Defendants' motion for summary judgment (ECF No. 14) is GRANTED; and

3.    The Clerk of the Court is directed to enter judgment for Defendants and CLOSE this case.

Dated:  February 20, 2026

_____
CHI SOO KIM
UNITED STATES MAGISTRATE JUDGE

4, tobi2259.25

21